UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ALAN TAVERAS,

                           Plaintiff,                    Case No.: 20 Civ. 1200 (AS)

        -against-

NEW YORK CITY, New York,

                           Defendant.
-------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**THE BELLANTONI LAW FIRM, PLLC**
*Attorneys for Plaintiff*
**2 Overhill Road, Suite 400**
**Scarsdale, New York 10583**
**abell@bellantoni-law.com**

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................... i

PRELIMINARY STATEMENT .............................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................ 2

RELEVANT NEW YORK CITY REGULATIONS .................................................. 3

NYC Admin. Code 10-303(a)(2) and (9) ................................................................ 3

38 RCNY 3-03: Grounds for Denial of Rifle/Shotgun Permit ....................................... 4

LEGAL STANDARD FOR SUMMARY JUDGMENT ............................................. 4

LEGAL STANDARD FOR SECOND AMENDMENT CHALLENGES ..................... 5

The Second Amendment ............................................................................................ 5

The *Bruen* Test: Required to be Applied in Second Amendment Challenges ............... 6

Founding Era 1791: The Historical Time Period For Determining National Traditions ........ 7

LEGAL ARGUMENT ............................................................................................. 8

I. THE MATERIAL FACTS ARE UNCONTESTED ............................................... 8

II. PLAINTIFF'S CONDUCT IS 'PRESUMPTIVELY PROTECTED' BY THE PLAIN TEXT OF THE SECOND AMENDMENT ..................................................................... 11

III. THE BURDEN TO JUSTIFY THE CHALLENGED REGULATIONS RESTS SQUARELY ON DEFENDANT'S SHOULDERS .................................................................. 11

CONCLUSION ....................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................. 4, 5

*Benton v. Maryland*,
    395 U.S. 784 (1969) ................................................................................................. 8

*Bliss v. Commonwealth*,
    12 Ky. 90 (1822)..................................................................................................... 13

*Crawford v. Washington*,
    541 U.S. 36 (2004) ................................................................................................... 7

*D.C. v. Heller*,
    554 U.S. 570 (2008) ............................................................................................. 5, 6

*Duncan v. Louisiana*,
    391 U.S. 145 (1968) ................................................................................................. 8

*Fulton v. City of Philadelphia*,
    141 S.Ct. 1868 (2021)............................................................................................... 7

*Gamble v. United States*,
    139 S.Ct. 1960 (2019)............................................................................................... 8

*Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*,
    565 U.S. 171 (2012) ................................................................................................. 7

*In re Oliver*,
    333 U.S. 257 (1948) ................................................................................................. 8

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005) ................................................................................. 4, 5

*Klopfer v. North Carolina*,
    386 U.S. 213 (1967) ................................................................................................. 8

*Lynch v. Donnelly*,
    465 U.S. 668 (1984) ................................................................................................. 7

*McDonald v. Chicago*,
    561 U.S. 742 (2010) ............................................................................................. 5, 6

i

*Near v. Minnesota*,
    283 U.S. 697 (1931) ................................................................................ 7

*Nevada Comm'n on Ethics v. Carrigan*,
    564 U.S. 117 (2011) ................................................................................ 7

*NYSRPA v. Bruen*,
    142 S.Ct. 211 (2022)......................................................................... passim

*Powell v. Alabama*,
    287 U.S. 45 (1932) .................................................................................. 8

*Ramos v. Louisiana*,
    140 S.Ct. 1390 (2020)............................................................................. 8

*Reynolds v. United States*,
    98 U.S. 145 (1878) .................................................................................. 7

*Romero v. St. Vincent's Servs., Inc.*,
    2023 WL 3477161 (2d Cir. May 16, 2023) ............................................ 4

*Terry v. Ashcroft*,
    336 F.3d 128 (2d Cir. 2003) ................................................................... 4

*Timbs v. Indiana*,
    139 S.Ct. 682 (2019)............................................................................... 8

*United States v. Cruikshank*,
    92 U.S. 542 (1876) ............................................................................ 5, 13

*Virginia v. Moore*,
    553 U.S. 164 (2008) ................................................................................ 7

*Washington v. Texas*,
    388 U.S. 14 (1967) .................................................................................. 8

*Wilson v. Arkansas*,
    514 U.S. 927 (1995) ................................................................................ 7

*Wyoming v. Houghton*,
    526 U.S. 295 (1999) ................................................................................ 7

**Statutes**

18 U.S.C. 922(g) .......................................................................................... 9
NYS Criminal Procedure Law §160.50 ....................................................... 9

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................ 1, 4

**Regulations**

27 C.F.R. 478.11 .................................................................................................................. 10
38 RCNY 3-03 ................................................................................................................. passim
NYC Admin. Code 10-303(a)(2), (9) ............................................................................ 1, 3, 4, 9

**Other Authorities**

Smith, Mark W., "Not all History is Created Equal: In the Post-*Bruen* World, the Critical Period
     for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868,"
     October 1, 2022 ............................................................................................................. 7, 12

## PRELIMINARY STATEMENT

Plaintiff, Alan Taveras, by and through his attorneys, submits the within Memorandum of Law, accompanying Local Rule 56.1 Statement of Undisputed Material Facts, Declaration of Alan Taveras with annexed exhibits, and Declaration of Amy L. Bellantoni with annexed exhibit, in support of Plaintiff's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56, demonstrating that there are no genuine issues of material fact to be decided, warranting judgment in Plaintiff's favor as a matter of law.

Plaintiff's right to possess weapons in 'common use' was violated by the New York City Police Department License Division (the "City" or "License Division"), which denied his application for a Rifle/Shotgun License by the enforcement and implementation of discretionary and subjective policies, procedures, and regulations pursuant to 38 RCNY 3-03(f) and (g) *et seq.* and New York City Administrative Code 10-303(a)(2), (9).

Under the governing test set forth by the Supreme Court in *NYSRPA v. Bruen*, 142 S.Ct. 2111 (2022), if the conduct being regulated is covered by the plain text of the Second Amendment, the government must prove that its conduct is consistent with the plain text, history, and tradition of firearm regulation in this Nation. *Bruen*, at 2126.

And post-ratification regulations that conflict with the plain text of the Second Amendment must yield to the plain text because "the text controls." *Bruen*, at 2137.

Here, the conduct being regulated - the possession of rifles and shotguns – is covered by the plain text of the Second Amendment, which mandates "the right to keep and bear Arms shall not be infringed."  By requiring a license to possess rifles and shotguns, and then by denying Plaintiff's application, the City is regulating conduct presumptively protected by the Second Amendment.

1

The burden is on the City alone to justify its regulations. As a matter of law, however, the City cannot justify its restrictions on Plaintiff's conduct because (i) regulating the possession of rifles and shotguns violates the plain text of the Second Amendment, and (ii) there is no Founding Era historical tradition of regulating the possession of rifles and shotguns.

The City will likely point to regulations from the mid-late 1800s and 1900s and even the 21st Century – post-ratification regulations – to justify its conduct. It may even delve into the laws of England, or some obscure laws from the 1300-1600s.

But that will not legally justify the City's restrictions. The Court is constrained to apply the proper historical time period for constitutional interpretation – the Founding Era. In the history of Supreme Court jurisprudence on interpreting the amendments codified in the Bill of Rights, the Supreme Court has relied exclusively on the Founding Era to understand its meaning. While references to post-ratification laws may be discussed by the Court, such discussions are for context and to confirm the *original meaning* of the Amendment at issue, not to alter it to fit some other meaning.

### STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

Alan Taveras ("Plaintiff") has no prohibitors to the possession, purchase, receipt, or transfer of firearms under state or federal law. See, Rule 56.1 Statement of Facts ("SOF") at ¶¶ 2-5. Plaintiff has never been convicted of a crime and is licensed to carry a handgun in over 35 states. *Id.* at ¶5.

Plaintiff applied to the NYPD License Division ("License Division") for a license to possess rifles and shotguns for self-defense, which was denied on April 18, 2018. *Id.* at ¶¶11-43.

---

1 The facts material to the Court's determination of the legal issues in this matter are contained in Plaintiff's accompanying Statement of Undisputed Material Facts pursuant to Local Rule 56.1 and incorporated herein by reference.

Plaintiff timely filed an internal appeal of the denial of his license, which was also denied. *Id.* at ¶¶44-62. The License Division denied Plaintiff's application based on false allegations by an ex-girlfriend over 7 years prior to his application. *Id.* at ¶¶23, 45. The charges were dismissed and sealed. *Id.* at ¶¶19-22. During the application process, Plaintiff informed the License Division that the allegations were false and that he had not committed any offense. *Id.* at ¶20.

The disapproval of Plaintiff's application, and the denial of his internal appeal, were caused by Defendants' implementation of a subjective and discretionary licensing scheme, and the enforcement of 38 RCNY 3-03(f) and (g) and NYC Administrative Code 10-303(2) and (9). *Id.* at ¶¶23-24, 45-47, 68-70.

Defendant's conduct violated Plaintiff's Second and Fourteenth Amendment rights by prohibiting his ability to lawfully possess rifles and shotguns for self-defense.

## RELEVANT NEW YORK CITY REGULATIONS

### *NYC Admin. Code 10-303(a)(2) and (9)*

New York City Admin. Code 10-303(a)(2) and (9) are discretionary factors used to deny Rifle/Shotgun License applications. 10-303 requires the denial of a Rifle/Shotgun permit if the License Division feels that the applicant "is not of good moral character" and/or if "good cause exists for the denial of the permit." See, 10-303(a)(2), (9).

Subsections (a)(2) and (9) are subjective, discretionary factors used to prevent an individual with no state or federal prohibitors from possessing firearms for self-defense, are inconsistent with this Nation's historical traditions of firearm regulation and violate the Second Amendment. Through the enforcement of subsections (a)(2) and (9), Plaintiff's right to purchase, possess, transfer, and receive rifles, shotguns, and ammunition, ammunition feeding devices, magazines, and clips was violated and continues to be violated.

3

*38 RCNY 3-03: Grounds for Denial of Rifle/Shotgun Permit*

Under NYC Admin. Code 10-303(a)(2) and (9), the License Division has the discretion to decide whether an applicant has "good moral character" and if there is "good cause" to deny the application.

38 RCNY 3-03 identifies various factors to justify the denial of an application for lack of "good moral character" and/or "other good cause."

38 RCNY 3-03, *et seq.* require denial of a Rifle/Shotgun license where the applicant (a) "has been arrested"; (f) "is the subject of an order of protection"; (g) "has a history of one or more incidents of domestic violence"; "(n) Other information demonstrates an unwillingness to abide by the law…a lack of concern for the safety of …other persons and/or for public safety, and/or other good cause for the denial of the permit."

The disapproval of Plaintiff's application, and denial of his appeal, were based on the License Division's reliance on and enforcement of the aforementioned regulations.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

The standard for granting summary judgment is well established. Summary judgment is granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Romero v. St. Vincent's Servs., Inc.*, No. 22-1476-CV, 2023 WL 3477161, at *1 (2d Cir. May 16, 2023) citing, Fed. R. Civ. P. 56(a).

To determine whether there is a genuine dispute as to material facts, the court is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *Id.* quoting, *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). The party seeking summary judgment bears the burden to demonstrate that no such disputes exist, and a fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.' *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson*

4

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Further, an issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Id.*, quoting *Anderson*, 477 U.S. at 248.

## LEGAL STANDARD FOR SECOND AMENDMENT CHALLENGES

Deciding whether the government's conduct violates the Second Amendment requires adherence to the plain text of the Second Amendment and application of the test announced by the Supreme Court in *NYSRPA v. Bruen*, 142 S.Ct. 211 (2022).

### The Second Amendment

The Second Amendment to the United States Constitution declares:

"A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

The Second Amendment does not *grant* the right to possess and carry weapons to protect oneself, it protects the preexisting right.[2] "…it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing right*. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it "shall not be infringed." it prohibits the government from infringing upon the basic, fundamental right of the individual to keep and bear arms for self-defense in the event of a violent confrontation. *Heller*, at 592 (emphasis supplied); accord, *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts*, 577 U.S. (2016) (stun guns).

"Individual self-defense is *the central component* of the Second Amendment right." *McDonald*, at 767, citing, *Heller*, at 599 (internal quotations omitted); *Heller*, at 595-599, 628.

---

2 *D.C. v. Heller*, 554 U.S. 570, 592 (2008) ("[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed (quoting, *United States v. Cruikshank*, 92 U.S. 542, 553 (1876)).

The Second Amendment is "deeply rooted in this Nation's history and tradition" and fundamental to our scheme of ordered liberty." *McDonald*, at 768.

### The *Bruen* Test: Required to be Applied in Second Amendment Challenges

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court reaffirmed the standard to be used by the courts to determine a Second Amendment challenge.

> "In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution ***presumptively protects*** that conduct.
>
> To justify its regulation, the government may not simply posit that the regulation promotes an important interest.
>
> Rather, the ***government must demonstrate*** that the regulation is consistent with this Nation's historical tradition of firearm regulation. ***Only if*** a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, at 2126 (emphasis added) (citation omitted).[3]

The *Bruen* Court confirmed that the test created by the circuit courts was "inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Bruen*, at 2129–30. To tighten the reins on the lower courts' adjudication of Second Amendment challenges the *Bruen* Court emphasized for the second time in its written opinion:

> "We ***reiterate*** that the standard for applying the Second Amendment is as follows:
>
> When the Second Amendments plain text covers an individual's conduct, the Constitution ***presumptively protects*** that conduct.

---

[3]"Rather than begin with its view of the governing legal framework, the dissent chronicles, in painstaking detail, evidence of crimes committed by individuals with firearms. See post, at 2163-2168 (opinion of BREYER, J.). The dissent invokes all of these statistics presumably to justify granting States greater leeway in restricting firearm ownership and use. But, as Members of the Court have already explained, "[t]he right to keep and bear arms ... is not the only constitutional right that has controversial public safety implications." *Bruen*, at 2126, n. 3 citing, *McDonald*, at 783.

The **government must then justify its regulation** by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, at 2129-2130 (emphasis added) (citation omitted).

### Founding Era 1791: The Historical Time Period For Determining National Traditions

Consistent with Supreme Court jurisprudence on all other provisions of the Bill of Rights, *Bruen* looked to the Founding Era, the ratification of the Bill of Rights in 1791, as the "principal period for determining the scope or meaning of a provision of the Bill of Rights."[4]

Noting that "the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," *Bruen* pointed to *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (Sixth Amendment); *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment); and *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122–125 (2011) (First Amendment). *Bruen*, at 2137–38 (emphasis added); see also, *Near v. Minnesota*, 283 U.S. 697 (1931) (First Amendment); *Reynolds v. United States*, 98 U.S. 145 (1878) (First Amendment); *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171 (2012) (First Amendment); *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021) (First Amendment); *Lynch v. Donnelly*, 465 U.S. 668 (1984) (First Amendment); *Wyoming v. Houghton*, 526 U.S. 295 (1999) (Fourth Amendment); *Wilson v. Arkansas*, 514 U.S. 927 (1995) (Fourth Amendment): *Benton v. Maryland*, 395 U.S. 784 (1969) (Fifth Amendment); *Gamble v. United States*, 139 S.Ct. 1960 (2019) (Fifth Amendment); *Ramos v. Louisiana*, 140 S.Ct. 1390 (2020) (Sixth Amendment); *Powell v. Alabama*, 287 U.S. 45 (1932) (Sixth Amendment); *Klopfer v. North Carolina*, 386 U.S. 213 (1967) (Sixth Amendment); *In re*

---

4 See, Declaration of Amy L. Bellantoni  at Exhibit 1, Smith, Mark W., "Not All History Is Created Equal," October 1, 2022, pp. 11-15. See also, https://www.tkc.edu/people/mark-w-smith/ (biographical background).

*Oliver*, 333 U.S. 257 (1948) (Sixth Amendment); *Duncan v. Louisiana*, 391 U.S. 145 (1968) (Sixth Amendment); *Washington v. Texas*, 388 U.S. 14 (1967) (Sixth Amendment); and *Timbs v. Indiana*, 139 S.Ct. 682 (2019) (Eighth Amendment).[5]

> "Incorporated Bill of Rights guarantees are enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.
>
> Thus, if a Bill of Rights protection is incorporated, **there is no daylight between** the federal and state conduct it prohibits or requires." *Timbs*, at 687 (emphasis added).

## LEGAL ARGUMENT

### I.  THE MATERIAL FACTS ARE UNCONTESTED

There is no dispute that Plaintiff was a resident of New York City, had no disqualifiers to the possession, purchase, transfer, and receipt of firearms under state or federal law, that the lawful possession of rifles and shotguns in the City required Plaintiff to apply for and obtain a Rifle/Shotgun License, that Plaintiff did apply for a Rifle/Shotgun License, and that his application was denied by the License Division.

The License Division's April 2018 Notice of Disapproval and November 2018 Notice of Denial After Appeal, which speak for themselves, demonstrate the License Division's enforcement of 38 RCNY 3-03(f) and (g) *et seq.* and NYC Admin. Code 10-303(a)(2). See, SOF ¶¶23, 45; Third Amended Complaint at ¶66.

There are no genuine issues of material fact in dispute. The determination of whether the City's regulations violated Plaintiff's Second Amendment rights, as enforced on state conduct by the Fourteenth Amendment is a question of law.

---

[5] *Id.* at pp. 17-30.

Implementing NYC Admin. Code 10-303(a)(2) and (9), and 38 RCNY 3-03, the License Division determined that Plaintiff lacked "good moral character" and otherwise found "good cause" to deny Plaintiff's application.

***38 RCNY 3-03(a)***

A prior arrest "shall be" used by the City employee to determine whether the applicant has "good moral character" and whether "other good cause exists for denial" – even if the charges were dismissed, as they were in Plaintiff's case. In denying Plaintiff's application, the City considered allegations underlying a charge that was dismissed by the court and terminated "in favor of the accused" pursuant to New York State Criminal Procedure Law section 160.50[6] to decide whether Plaintiff has "good moral character" and/or whether there is "good cause" to deny his application. This factor calls for a subjective determination of an applicant's "moral character" and allows the government unfettered discretion to deny a presumptively protected constitutional right in violation of the Second and Fourteenth Amendments.

State and federal statutes already identify bright line, objective factors for disqualifying an individual from possessing and/or purchasing firearms, which include ***convictions*** of felony offenses and certain misdemeanors,[7,8] not mere arrests.

Neither Congress nor the New York legislature included every criminal offense in the prohibited conviction category, meaning that those offenses that are not enumerated therein were specifically ***disregarded*** from the *sui generis* of offenses, in their opinions, that rise to the level of dangerousness warranting termination of a constitutionally protected right. Also excluded from the *per se* list are non-criminal violations and nuisance offenses. Generally speaking, the intent behind the prohibition statutes was to prevent people adjudicated as "dangerous" from possessing

---

[6] SOF ¶¶18-19 and Taveras Dec. at Ex. 1.

[7] See, 18 U.S.C. 922(g) [federal prohibitors].

[8] See, Penal Law sections 265.00(17) [listing serious offense misdemeanors]; 265.01(4) [barring possession of rifles and shotguns if convicted of a felony or serious offense misdemeanor].

firearms. Congress even excluded "white collar" felonies from the *per se* list.[9] Leaving aside the issue of whether state and federal prohibitions are consistent with this Nation's historical traditions of firearm regulation, even the *per se* list does not include an "arrest" alone.

### 38 RCNY 3-03(f)

Subsection (f) requires the denial of an application if the applicant is the subject of an order of protection or a temporary order of protection. The City interprets and enforces subsection (f) to deny applications if the applicant ***has ever been*** the subject of an Order of Protection.

At the time of his application, Plaintiff was not the subject of an order of protection; there was no state or federal prohibition on Plaintiff's purchase or possession of firearms.  SOF at ¶39.

### 38 RCNY 3-03(g)

Under subsection (g), an application is denied if the applicant "has a history of one or more incidents of domestic violence." As with subsection (a), this is a discretionary and subjective factor, untethered to a prohibiting conviction, enforced to preclude Plaintiff's protected conduct.

### 38 RCNY 3-03(n)

Under subsection (n), an application is denied if the License Division feels "other information demonstrates an unwillingness to abide by the law…a lack of concern for the safety of oneself and/or other persons  and/or for public safety, and/or other good cause for the denial of the permit." Plaintiff's application was denied under subsection (n) because the License Division felt – based on allegations unsupported by any conviction – that "the serious nature of these incidents raise safety concerns for [Plaintiff] and others."

By enforcing the challenged regulations, the License Division foreclosed Plaintiff's ability to engage in conduct presumptively protected by the Second and Fourteenth Amendments.

_____

9 See, 921(a)(20)(A) (a 'crime punishable by imprisonment for a term exceeding one year' does not include . . . any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices."); see also, 27 C.F.R. 478.11.

## II.  PLAINTIFF'S CONDUCT IS 'PRESUMPTIVELY PROTECTED' BY THE PLAIN TEXT OF THE SECOND AMENDMENT

Under the test annunciated in *Bruen*, "When the Second Amendment's plain text covers an individual's conduct, the Constitution **presumptively protects** that conduct." *Bruen*, at 2129–30 (emphasis added). And "to the extent later history contradicts what the text says, the text controls." *Bruen*, at 2137.

The conduct regulated by the City - Plaintiff's possession of rifles and shotguns - is 'presumptively protected' by the plain text of the Second Amendment, which declares that the right to "keep and bear Arms shall not be infringed."

"As we explained in *Heller*, the textual elements of the Second Amendment's operative clause – 'the right of the people to keep and bear Arms, shall not be infringed' - **guarantee the individual right to possess and carry weapons** in case of confrontation." *Bruen*, at 2134 (internal citations and quotation marks omitted) (emphasis added).

## III. THE BURDEN TO JUSTIFY THE CHALLENGED REGULATIONS RESTS SQUARELY ON DEFENDANT'S SHOULDERS

"The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. **Only then** may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, at 2129-2130.

Because Plaintiff's conduct is "presumptively protected" by the plain text of the Second Amendment, the City must "justify" the challenged regulations "by demonstrating that [they are] consistent with the Nation's historical tradition of firearm regulation." *Bruen*, at 2129-2130.

Consistent with Supreme Court jurisprudence on its interpretation of all other provisions of the Bill of Rights, and continued in *Bruen*, this Court is constrained to historical traditions in and around the ratification of the Bill of Rights in 1791 as the "principal period for determining

the scope or meaning of a provision of the Bill of Rights" because the scope of the protection applicable to the Federal Government and States is pegged to the "public understanding" of the Second Amendment right when the Bill of Rights was adopted in 1791. *Bruen*, at 2136; Bellantoni Dec. Ex. 1 at pp. 4, 11-15, 26-27.

Plaintiff has no further burden under the *Bruen* analysis.

But it should not be lost on the Court that the plain text of the Second Amendment mandates that the right to keep and bear arms "*shall not be infringed*."

Long guns have been part of this nation's history since the colonists arrived and are, indisputably, 'arms' covered by the plain text of the Second Amendment. The free and unabridged possession, purchase, trading, and use of long guns is part of this Nation's history and tradition. No permission from the government, licensing, registration, or any other action was required (or even imagined) to exercise the preexisting right that was later codified in the Second Amendment. Indeed, the purpose of codifying the right to keep and bear arms and declaring that it "shall not be infringed"[10] was to prevent any encroachment of that right by the government.

***First***, firearm licensing did not exist in the Founding Era. No action was required or permission sought from a government employee before possessing rifles and shotguns. The plain text of the Second Amendment guarantees[11] the free exercise of that right with its unconditional declaration that the right "*shall not be infringed*." The Amendment does not say "shall not be infringed after obtaining permission from the government." The Bill of Rights was created to ***prevent*** the government from interfering with preexisting human rights – not to ***give*** the government power. "As we said in *United States v. Cruikshank*, 92 U.S. 542, 553, 23 L.Ed. 588

---

10 Infringe: encroach, limit, offend. https://www.merriam-webster.com/thesaurus/infringe
11 *Heller*, at 592 ("Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation.").

(1876), "[t]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed ...." *Heller*, at 592.

Firearm regulations did not appear well after the ratification of the Bill of Rights in 1791. *Bliss v. Commonwealth*, 12 Ky. 90 (1822). Not quite a "National tradition,' the regulations involved restrictions on *handguns*, not long guns and, even then, the regulation was limited *concealed* carriage of *handguns*.

Licensing requirements are even further removed from 1791, and thus "do not provide as much insight into [the Amendment's] original meaning as earlier sources. *Bruen*, at 2137 citing, *Heller*, at 614 (referring to post-Civil War discussions of the right to keep and bear arms, which took place 75 years after the ratification).

No one in the Founding Era was required to seek and obtain permission from the government to own rifles and shotguns.  The very idea is repugnant to the plain text of the Second Amendment – the colonists had just fought to secure their freedom from Great Britain – using their own weapons to do so. The colonists intended to prevent *any* government control over their right to speak, worship, and freely possess 'Arms' for use in case of confrontation.

***Second***, notwithstanding the absence of any licensing requirements in the Founding Era, *Bruen* was not a blanket approval of licensing schemes. The Court referenced existing *concealed carry handgun licensing*, allowing "the 43 states that employ objective shall-issue licensing regimes" to continue to exist solely because they "contain only narrow, objective, and definite standards…rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion" like New York City's "may-issue" licensing regimes. *Bruen*, at 2138, 2162. That said, the *Bruen* Court warned that even "shall-issue" *handgun licensing* regimes may be found

13

unconstitutional because "any permitting scheme can be put toward abusive ends…" *Bruen*, at 2138.

**Third**, *Bruen* reiterated the scope of the Second Amendment that was previously declared in *Heller*: "As we explained in *Heller*, the "textual elements" of the Second Amendment's operative clause - "the right of the people to keep and bear Arms, shall not be infringed" - "guarantee the individual right to possess and carry weapons in case of confrontation." *Bruen*, at 2134 quoting, *Heller*, at 592.  In spite of the plain text of the Second Amendment, and the historical analysis and holdings in *Heller, McDonald* and *Caetano*, New York City deprives people with no state or federal disqualifiers to firearm possession, like Plaintiff, from exercising the basic right to possess and purchase firearms for self-defense.

The challenged regulations are contemporary control measures that contradict the plain text of the Second Amendment. And "where later history contradicts what the text says, the text controls." *Bruen*, 142 S. Ct. at 2137.

**Fourth,** at the ratification of the Second Amendment there was no National 'tradition' of governmental prohibition of the possession of rifles and shotguns for individuals, including prohibitions based on mere accusations and in the absence of a conviction – like those reasons used by the License Division to deprive Plaintiff of his Second Amendment rights. And imposing criminal sanctions against ordinary people simply who engage in protected conduct has no historical analogue in the Founding Era.

**Last,** the City's conduct as set forth herein caused Plaintiff actual harm, to wit, the loss of his Second Amendment rights.

**CONCLUSION**

Plaintiff's motion for summary judgment should be granted in its entirety.

Dated: August 18, 2023
      Scarsdale, New York

                                    THE BELLANTONI LAW FIRM, PLLC
                                    *Attorneys for Plaintiff, Alan Taveras*

                                  _____/s/_____
                                    Amy L. Bellantoni (AB3061)
                                    2 Overhill Road, Suite 400
                                    Scarsdale, New York 10583
                                    abell@bellantoni-law.com

15